UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | |
|---|---|
| BRET S. BEILER, | ) |
| | ) |
| Plaintiff, | ) |
| | ) CAUSE NO. 1:11-CV-380 PS |
| vs. | ) |
| | ) |
| JAY COUNTY SHERIFF, *et al.*, | ) |
| | ) |
| Defendants. | ) |

## OPINION AND ORDER

Bret S. Beiler, a *pro se* plaintiff, complains about the conditions of his confinement while he was at the Jay County Jail. Beiler was incarcerated when he filed this action, but has since been released from custody. (DE 27.) Specifically, he claims that he received an inadequate diet; that he was subjected to excessively cold temperatures; that jail staff failed to protect him from an attack by other inmates; that he was denied visits with his minister; and that he was put in segregation for retaliatory reasons. (DE 39.) The three remaining defendants—Sheriff Larry Ray Newton, Jr., Jail Commander Nathan Keever, and Correctional Officer Betsy Gagle—move for summary judgment. (DE 85.) For the reasons stated below, the motion is granted.

As an initial matter, the defendants' motion was filed on September 6, 2013, and Beiler has not responded despite being given proper notice. (DE 90.) Pursuant to N.D. IND. LOCAL RULE 7-1(d)(4), a party's failure to file a response within the time prescribed may subject the motion to summary ruling. Nevertheless, "[s]trict enforcement of [local rules] does not mean that a party's failure to submit a timely filing automatically results in summary judgment for the opposing party." *Wienco, Inc. v. Katahn Assoc., Inc.*, 965 F.2d 565, 568 (7th Cir. 1992). Rather,

that failure "causes all factual assertions alleged by the opposing party to be deemed admitted." *Id.* It is for this reason that the facts set forth below are undisputed.

**Factual Background**

Newton was the Sheriff of Jay County during all times relevant to this lawsuit. (DE 87-1, Newton Aff. ¶ 1.) Keever is the jail commander and oversees operations at the jail. (DE 87-10, Keever Aff. ¶¶ 1-2.) Gagle has been an officer at the jail since 2010. (DE 87-11, Gagle Aff. ¶¶ 1-2.) Beiler was incarcerated at the jail, both as a pretrial detainee and a convicted inmate, during different periods in 2009, 2010, 2011, and 2012. (DE 87-17, Beiler Dep. Tr. at 10-11, 25-26.)

During December 2009, there were problems with the furnace in Beiler's cellblock. (DE 87-7, Jail Logs at 1-14.) When the Sheriff was alerted to a problem, he would contact a local contractor to service the furnace. (DE 87-1, Newton Aff. ¶ 10.) When the furnace was not functioning properly, jail staff used space heaters as needed and also gave inmates extra blankets if they requested them. (*Id.* ¶ 11; DE 87-7, Jail Logs at 4-14.) Heating records indicate that during the time the furnace was malfunctioning, temperatures in Beiler's cellblock averaged 70 to 72 degrees. (DE 87-7, Jail Logs at 7-12.)

On September 29, 2011, Gagle participated in a search for contraband on Beiler's cellblock. (DE 87-11, Gagle Aff. ¶ 3.) She was assigned to search Beiler's cell, and during her search she went through his papers to ensure they did not contain contraband. (*Id.*) Gagle knew from experience that inmates often hide contraband in mail and in between documents. (*Id.*) Gagle did not read the papers, nor does she remember all the particulars, but she recalls noticing

that her name appeared on one of the documents. (*Id.*) It was not of concern to her, but she may have joked with Beiler that he should learn to spell her name right.[1] (*Id.*)

The following day, Gagle was supervising laundry collection on Beiler's cellblock. (*Id.* ¶ 4.) As Beiler was dropping his laundry off, he called Gagle a "dumb ass bitch" in a loud and aggressive manner. (*Id.*) He appeared to be showing off for the benefit of other inmates who were present, which in Gagle's view undermined her authority and disrupted the facility. (*Id.*) Gagle cited Beiler for disruptive conduct and took him to segregation. (*Id.*) He was held in segregation for 48 hours, during which time he received daily showers and normal food and amenities, but had no commissary privileges and no television. (*Id.* ¶ 5.)

On October 25, 2011, Ronald Berry, an inmate at the jail, reported to Gagle that Beiler was harassing him. (*Id.* ¶ 6.) Gagle told Berry to just ignore Beiler. (*Id.*) Shortly thereafter, Gagle left the area. (*Id.* ¶ 7.) She later heard that there had been a fight in the cellblock and that Beiler had been punched in the face. (*Id.*) She asked Beiler who attacked him, but he would not say. (*Id.*) An investigation was conducted of this incident by another staff member, and several inmates on the cellblock were questioned. (DE 87-15, Wells Aff. & Ex. 1.) Beiler maintained that it was Berry and another inmate, Kable Daniels, who had punched him. (*Id.*, Ex. 1.) No other inmate corroborated his account, nor was there any video feed available from the incident. (*Id.*)

Prior to the fight, Gagle had no reason to believe Berry was going to attack Beiler, nor did she have any knowledge of Berry ever instigating a physical altercation with any inmate. (DE 87-11, Gagle Aff. ¶¶ 6-7.) Jail records reflect that prior to this incident neither Berry nor

---

[1] Gagle's affidavit indicates that her first name is actually spelled "Betsi." (DE 87-11, Gagle Aff.)

Daniels had been involved in any incident in which they had attacked or threatened another inmate. (DE 87-1, Newton Aff. ¶ 18.) Beiler never alerted Gagle to any problem he had with Berry, nor did he request that she protect him from Berry or Daniels. (DE 87-11, Gagle Aff. ¶ 6.) Beiler admits that he had no prior knowledge that Daniels or Berry would attack him, nor did he feel that he was in any particular danger; in his words, "I was actually one of the guys in that block [who] felt comfortable about not being attacked[.]" (DE 87-17, Beiler Dep. Tr. at 129.)

In December 2011, Beiler began complaining about his meals at the jail, specifically, that not enough food was being served. (DE 87-1, Newton Aff. ¶¶ 3-5.) Meals at the jail were prepared in accordance with meal plans developed by a dietician certified by the state of Indiana. (*Id.* ¶ 4 & Ex. 2) When Sheriff Newton received Beiler's complaints about the food, he reconfirmed that all meals were being prepared in accordance with the dietary plan. (*Id.* ¶¶ 5.) During this same period, there were multiple reports from jail staff and other inmates that Beiler was acting erratically at mealtime, including giving away most of his food, appearing to make himself vomit after meals, and exercising immediately after eating his meals, including when he was in the shower.[2] (DE 87-4, Jail Logs at 1-28; DE 87-1, Newton Aff. ¶ 6; DE 87-10, Keever Aff. ¶ 5.) Based on Beiler's unusual behavior, the Sheriff had Beiler moved to a receiving cell so jail staff could better monitor his eating habits. (DE 87-1, Newton Aff. ¶ 7.) The Sheriff's decision was based in part on the recommendation of medical staff. (*Id.*)

In the receiving cell, inmates have normal recreation time, showers, and amenities, but are not permitted to purchase commissary items. (*Id.* at ¶ 8.) While Beiler was in the receiving cell his eating habits were monitored by correctional officers, and he was seen regularly by jail

---

[2] One inmate reported that Beiler told him he was trying to keep his weight down so that he could pursue a lawsuit against the jail. (DE 87-4 at 27.)

medical staff. (*Id.* ¶ 9; DE 87-5, Jail Logs at 1-3.) On January 4, 2012, nursing staff listed his weight as 146 lbs., whereas his weight upon intake at the jail in April 2010 was 160 lbs. (DE 87-5, Jail Logs at 1.) After approximately three weeks in the receiving cell, it appeared that Beiler's eating habits had returned to normal, and on January 18, 2012, the Sheriff released him back to the general population. (DE 87-1, Newton Aff. ¶ 9.) Nursing staff continued to monitor his weight, and on February 18, 2012, his weight was measured at 148 lbs. (DE 87-4, Jail Logs at 25.)

During Beiler's time at the jail, there was a policy requiring one-on-one clergy visits to be conducted via video monitor. (DE 87-1, Newton Aff. ¶ 13.) The Sheriff instituted the policy after several individuals falsely represented themselves as clergy and used the opportunity to bring contraband to inmates or to engage in unauthorized contact. (*Id.*) Although these meetings were conducted via video monitor, jail staff were ordered not to listen to these conversations. (DE 87-10, Keever Aff. ¶ 14.) Jail records reflect that Beiler had clergy visits on September 16, 2011, December 8, 2011, December 16, 2011, and February 6, 2012. (DE 87-8, Jail Logs at 1-4.) As far as the Sheriff knows, Beiler had clergy visits whenever he wanted them. (DE 87-1, Newton Aff. ¶ 14.) Beiler has no information that the defendants or other jail staff listened to his conversations during these visits. (DE 87-17, Beiler Dep. Tr. at 100.)

## Discussion

Summary judgment must be granted when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). Even though the facts are undisputed due to Beiler's failure to respond to the summary judgment

motion, I must still decide whether, "given the undisputed facts, summary judgment is proper as a matter of law." *Wienco,* 965 F.2d at 568.

As a preliminary matter, it is not entirely clear from the record when during these events Beiler was a pretrial detainee and when he was a convicted inmate serving a sentence. Although this would impact whether the Fourteenth or Eighth Amendment applies, the governing standards are functionally equivalent, and "anything that would violate the Eighth Amendment would also violate the Fourteenth Amendment." *Lewis v. Downey*, 581 F.3d 467, 473 (7th Cir. 2009). In evaluating a conditions of confinement claim, courts conduct both an objective and a subjective inquiry. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). The objective prong asks whether the alleged deprivation is "sufficiently serious" so that "a prison official's act results in the denial of the minimal civilized measure of life's necessities." *Id.* Inmates are entitled to be provided with adequate food, clothing, shelter, bedding, hygiene materials, and sanitation. *Knight v. Wiseman*, 590 F.3d 458, 463 (7th Cir. 2009); *Gillis v. Litscher*, 468 F.3d 488, 493 (7th Cir. 2006). However, "the Constitution does not mandate comfortable prisons," *Rhodes v. Chapman*, 452 U.S. 337, 349 (1981), and inmates cannot expect the "amenities, conveniences, and services of a good hotel." *Harris v. Fleming*, 839 F.2d 1232, 1235 (7th Cir. 1988); *see also Rice ex rel. Rice v. Corr. Med. Servs.*, 675 F.3d 650 (7th Cir. 2012) ("Prison conditions may be harsh and uncomfortable without violating the Eighth Amendment's prohibition against cruel and unusual punishment.").

On the subjective prong, the inmate must show that the defendant acted with deliberate indifference to his health or safety. *Farmer*, 511 U.S. at 834. As the Seventh Circuit has explained:

> [C]onduct is deliberately indifferent when the official has acted in an intentional or criminally reckless manner, *i.e.*, the defendant must have known that the plaintiff was at serious risk of being harmed and decided not to do anything to prevent that harm from occurring even though he could have easily done so.

*Board v. Farnham*, 394 F.3d 469, 478 (7th Cir. 2005) (internal citations and quotation marks omitted); *see also McNeil v. Lane*, 16 F.3d 123, 125 (7th Cir. 1993) ("Obduracy and wantonness rather than inadvertence or mere negligence characterize conduct prohibited by the Eighth Amendment.").

Beiler's first claim is that he was denied adequate heating from December 2, 2009, to December 13, 2009. Suffice it to say he has not established that he was denied the minimal civilized measure of life's necessities with respect to the temperatures in his cell block. Nor has he established any intentional deprivation by jail officials; instead the evidence shows an unusual situation caused by a malfunctioning furnace, which jail staff promptly addressed by contacting an outside contractor to service the furnace. The record is devoid of evidence that Beiler was subjected to excessively cold temperatures, or that the defendants were deliberately indifferent to his health or safety. *See Antonelli v. Sheahan*, 81 F.3d 1422, 1430 (7th Cir. 1996) (short-term deprivation "and an unintended one at that" did not establish a constitutional violation). Accordingly, the defendants are entitled to summary judgment on this claim.

Beiler next claims that he was denied adequate food between December 2, 2011, and February 2012, but again the record fails to support this assertion. Instead, the record shows that all meals were prepared at the jail in accordance with a diet plan by a certified dietitian. Although Beiler may not have liked the taste of some of the food, inmates are entitled to a nutritionally adequate diet, but not to food that is tasty, hot, or even appetizing. *Lunsford v. Bennett*, 17 F.3d 1574, 1578 (7th Cir. 1994); *Harris*, 839 F.2d at 1235. Nor is there any evidence

7

the defendants were deliberately indifferent to Beiler's needs; instead, when the Sheriff received Beiler's complaints about the food, he verified that the meals were being prepared and served in accordance with the dietary plan. Beiler has not established a constitutional violation on this ground.

Relatedly, Beiler claims that the Sheriff placed him in a receiving cell from December 2011 to January 2012 for no legitimate reason. To the contrary, the evidence shows that he was placed there for his own protection to monitor his eating habits based on his erratic behavior. Indeed, once jail officials were on notice that Beiler might be trying to harm himself by not eating properly, they were required to take steps to prevent him from injury. *See Owens v. Hinsley*, 635 F.3d 950, 955 (7th Cir. 2011); *Sanville v. McCaughtry*, 266 F.3d 724, 737 (7th Cir. 2001). The record indicates that they took appropriate steps here. Although it may not have been particularly comfortable in the receiving cell, Beiler has not established anything approaching a constitutional violation in connection with the conditions there. The record shows that he was in the receiving cell for approximately three weeks, during which time he had regular recreation, showers, meals, and amenities. As soon as it was determined that he was eating properly, he was released to the general population. The defendants are entitled to summary judgment on this claim.

Next, Beiler claims that Gagle placed him in segregation in September 2011 for retaliatory reasons. To establish a claim of retaliation, the plaintiff must demonstrate: (1) he engaged in activity protected by the First Amendment; (2) he suffered a deprivation that would likely deter First Amendment activity in the future; and (3) the defendant's action was motivated by the protected activity. *See Gomez v. Randle*, 680 F.3d 859, 866 (7th Cir. 2012). Beiler has

8

failed to satisfy these requirements. The evidence shows that he was placed in segregation because he cursed at Gagle in front of other inmates and disrupted the facility. Although there is some evidence that Gagle saw her name on a paper inside Beiler's cell the day before the laundry incident, there is no evidence that she was upset by this, or even that the document constituted protected First Amendment activity. *See id.* Moreover, suspicious timing alone cannot create a triable issue of fact in connection with retaliation claim. *See Andonissamy v. Hewlett-Packard Co.,* 547 F.3d 841, 851 (7th Cir. 2008) ("[M]ere temporal proximity is not enough to establish a genuine issue of material fact."); *see also Soto v. Bertrand*, 328 Fed. Appx. 331 (7th Cir. May 6, 2009) (suspicious timing alone did not warrant a trial on inmate's claim that he was placed in segregation in retaliation for his grievances). Nor is the timing here particularly suspicious, since the undisputed evidence shows that Beiler called Gagle a "dumbass bitch" in a separate incident the day after the search. In short, the defendants are entitled to summary judgment on this claim.

Beiler next claims that he was subjected to unduly harsh conditions during the 48 hours he spent in segregation. But at most the evidence shows he was without television and commissary privileges during this period, which are not the type of deprivations that trigger Eighth Amendment concerns. *See James v. Milwaukee County,* 956 F.2d 696, 699 (7th Cir. 1992) ("[N]ot all prison conditions trigger eighth amendment scrutiny—only deprivations of basic human needs like food, medical care, sanitation, and physical safety. . . [A] prisoner who is denied a pack of playing cards or a television set has not set out a deprivation of constitutional dimensions under the eighth amendment."); *see also Caldwell v. Miller*, 790 F.2d 589, 593 n.16 (7th Cir. 1986) ("inactivity, lack of companionship and a low level of intellectual stimulation do

not constitute cruel and unusual punishment"). Again, Beiler has failed to establish a constitutional violation.

Next, Beiler claims that the defendants failed to protect him from the attack by Berry and Daniels in October 2011. Correctional officials have a constitutional duty to protect inmates "from violence at the hand of other inmates." *Grieveson v. Anderson*, 538 F.3d 763, 777 (7th Cir. 2008). Nevertheless, "prisons are dangerous places. Inmates get there by violent acts, and many prisoners have a propensity to commit more." *Id.* Therefore, a failure-to-protect claim cannot be predicated "merely on knowledge of general risks of violence in a detention facility." *Brown v. Budz*, 398 F.3d 904, 913 (7th Cir. 2005). Instead the plaintiff must establish that "the defendant had actual knowledge of an impending harm easily preventable, so that a conscious, culpable refusal to prevent the harm can be inferred from the defendant's failure to prevent it." *Santiago v. Wells*, 599 F.3d 749, 756 (7th Cir. 2010).

But there is no evidence that Gagle knew that Berry may be violent towards Beiler. The only thing she knew was the contrary. Gagle was told it was *Beiler* who was harassing *Berry*. She told Berry to just ignore him. Neither she nor the other defendants had reason to believe Berry or Daniels would attack Beiler, as neither had a past record of violent behavior. Indeed, Beiler himself saw no risk of harm and never conveyed to the defendants that he was at risk of being attacked. Accordingly, the defendants are entitled to summary judgment on this claim.

Finally, Beiler claims he was denied visits with his minister between August 2011 and February 2012. Prisoners enjoy a right to the free exercise of their religion under the First Amendment. *Vinning-El v. Evans*, 657 F.3d 591, 592-93 (7th Cir. 2011). However, a prison may impose restrictions on the exercise of religion that are reasonably related to legitimate

10

penological objectives, which include safety, security, and economic concerns. *Turner v. Safley*, 482 U.S. 78, 89-91 (1987); *Ortiz v. Downey*, 561 F.3d 664, 669 (7th Cir. 2009). Inmates are also entitled to religious protection under the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), which provides:

> No government shall impose . . . a substantial burden on the religious exercise of a person residing in or confined to an institution . . . unless the government demonstrates that imposition of the burden on that person—
>
> > (1) is in furtherance of a compelling governmental interest; and
> > (2) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000cc-1(a). If a plaintiff demonstrates that his religious exercise has been substantially burdened under RLUIPA, the burden shifts to the defendants to show that the challenged conduct is the least restrictive means of pursuing a compelling governmental interest. *Nelson v. Miller*, 570 F.3d 868, 877 (7th Cir. 2009). In making this determination, courts must afford "due deference to the experience and expertise of prison and jail administrators in establishing necessary regulations and procedures to maintain good order, security and discipline, consistent with consideration of costs and limited resources." *Cutter v. Wilkinson*, 544 U.S. 709, 723 (2005).

Here, Beiler has not demonstrated any undue interference with the exercise of his religion. As far as the record reveals, Beiler was never denied clergy visits, and in fact he had four such visits during the period about which he complains. He was required to talk to his minister through a video monitor for legitimate security reasons, but the record is devoid of any evidence that the defendants eavesdropped on these conversations or otherwise interfered with them. Beiler has not argued or demonstrated that the use of the monitors themselves substantially

11

burdened his religious practice (instead his claim was that he was denied visits outright), and I decline to manufacture such an argument for him.³ Based on the record, the defendants are entitled to summary judgment on this claim.

Finally, the defendants argue that they are entitled to qualified immunity. The doctrine of qualified immunity protects government officials from liability for civil damages "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). The protection of qualified immunity will apply if the official made a mistake of fact, a mistake of law, or a combination of the two. *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). In essence, qualified immunity protects all but the "plainly incompetent or those who knowingly violate the law." *Hunter v. Bryant*, 502 U.S. 224, 227-29 (1991). Qualified immunity is an affirmative defense, but once it has been raised it becomes the plaintiff's burden to defeat it. *Wheeler v. Lawson*, 539 F.3d 629, 639 (7th Cir. 2008). To do so the plaintiff must point to closely analogous cases which would have put the defendants on notice that their actions were unconstitutional, or must demonstrate that the defendants' actions were so egregious that a reasonable person in the defendants' position would have known their conduct was illegal. *Morrell v. Mock*, 270 F.3d 1090, 1100 (7th Cir. 2001).

Even if I were to assume that Beiler could establish a constitutional violation on any of the above grounds, the defendants would be entitled to qualified immunity. As stated above, Beiler did not respond to the defendants' motion, and he has not pointed me to any cases—nor

---

³ I also granted Beiler leave to proceed on a Fourteenth Amendment equal protection claim pertaining to the alleged denial of clergy visits, but as stated above he has failed to introduce any evidence that he was actually denied visits, let alone that he was treated more harshly than other inmates. *See generally May v. Sheahan*, 226 F.3d 876, 882 (7th Cir. 2000).

has my research revealed any—finding a violation of an inmate's constitutional rights under similar circumstances. Nor was Beiler subjected to such egregious treatment that the defendants should have known they were acting illegally. To the contrary, the record demonstrates that the defendants treated Beiler professionally and with care for his needs.

**Conclusion**

For the reasons set forth above, the defendants' motion for summary judgment (DE 85) is **GRANTED.** The clerk is **DIRECTED** to enter judgment in favor of defendants Larry Ray Newton, Jr., Nathan Keever, and Betsy Gagle.

**SO ORDERED**.

ENTERED: December 17, 2013.   /s/ Philip P. Simon
Philip P. Simon, Chief Judge
United States District Court